# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Sam O. WEISER
### Electrician's Mate Third Class (E-4), U.S. Coast Guard

### CGCMG 0375
### Docket No. 1469

### 21 September 2020

General court-martial tried on 11-25 January 2019.

| | |
|---|---|
| Military Judge: | CDR Tamara S. Wallen, USCG |
| Appellate Defense Counsel: | LT Carolyn M. Bray, USCG (argued) |
| Appellate Government Counsel: | LT Nicholas Hathaway, USCG (argued) |
| Special Victims Counsel: | LCDR Jason W. Roberts, USCG |
| | Mr. Paul T. Markland |

## BEFORE
## McCLELLAND, HAVRANEK & BRUBAKER
Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of members with enlisted representation convicted Appellant, contrary to his pleas, of one specification of sexual assault, one specification of indecent recording, two specifications of broadcasting an indecent recording, and four specifications of indecent conduct, in violation of Articles 120, Article 120c, and Article 134, Uniform Code of Military Justice (UCMJ) (2016). The members sentenced Appellant to confinement for four years, reduction to E-1, and a dishonorable discharge, which the Convening Authority approved.

On appeal, Appellant asserts that:

(1) He was deprived of due process because he was charged with violating Article 120, UCMJ, under a bodily harm theory, but prosecuted and convicted under the theory that the putative victim was incapable of consenting due to alcohol impairment;

(2) Appellant was deprived of effective assistance of counsel when his trial defense counsel failed to obtain expert assistance;[1]

(3) The military judge abused her discretion by excluding evidence under Military Rule of Evidence (M.R.E.) 412, Manual for Courts-Martial (MCM), United States (2016 ed.);

(4) Appellant's conviction under Article 120, UCMJ, is factually and legally insufficient; and

(5) The marital relationship between the original staff judge advocate and the chief of military justice created an appearance of unlawful command influence.[2]

We disagree and affirm.

**Factual Background**

A number of shipmates from USCGC ACTIVE (WMEC 618) were celebrating St. Patrick's Day at local bars in Port Angeles, Washington. Among them were Ensign (ENS) W[3] and Appellant. Although they arrived independently, their groups eventually merged, at which point Appellant, ENS W, Machinery Technician Third Class (MK3) F, and others talked, danced, and drank. ENS W, who had consumed approximately seven alcoholic beverages over the course of the evening and eaten little, started feeling dizzy, so she called for a taxi. After Appellant and MK3 F followed her out, she offered to share the taxi with them, telling the driver to take her home first, then them. During the ride, she felt "very drunk." (R. at 267.)

When they arrived at her home, ENS W had difficulty finding her cell phone. Appellant and MK3 F helped look for it and escorted her to her door. ENS W gave the driver some cash to drive the two home. Feeling "[v]ery tired, very drunk" and "a little nauseous," ENS W gave up looking for her phone and lay down in her living room next to her couch. (R. at 273). She heard some kind of confrontation between Appellant and MK3 F, but "just wanted to go to sleep." (R. at 273). At that point, MK3 F got back into the taxi and went home. Appellant remained.

---

[1] We heard oral argument on issues (1) and (2).

[2] We conclude that Appellant has not met his initial burden to show that "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (citation omitted) (internal quotation marks omitted). *See also United States v. Washington*, 80 M.J. 106, 112–13 (C.A.A.F. 2020); *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999). We therefore reject this assignment of error.

[3] Although ranks and statuses of witnesses changed by the time of trial, for simplicity, we will refer to ranks and statuses at the time of the alleged offenses.

ENS W's next memory was waking up upstairs in her room to a flash, which she later recognized as coming from a camera, and realizing that she was not wearing any clothes. She did not move because "it was a shock," she "didn't really understand what was going on," "just wanted to go to sleep," and "didn't know where I was, what to do, what was going on." (R. at 276.) She attributed these feelings to the effects of alcohol. She then remembered another flash, her legs being spread apart, and feeling a finger or fingers being inserted into her vagina. She did not say anything while this was happening, but when she perceived that Appellant was about to engage in sexual intercourse with her, "that was a big deal for me and I think I tried to push him away, and turn over. I think I might have said no, unable to communicate that I didn't want that." (R. at 277–78.) Appellant stopped and, after calling a friend for a ride home, left.

ENS W affirmed that she did not consent to Appellant penetrating her vagina with his fingers, explaining that while it was happening, she just hoped it would stop but "I couldn't – I couldn't do anything, I guess." She also affirmed that when she told Appellant no, he stopped, and that at no other time did she tell Appellant to stop or ask him to leave.

Appellant took a total of fifteen photographs of ENS W's nude body in various positions, including two showing his fingers inside her vagina. He saved the photographs to a password-protected file on his phone and showed some of them to members of the crew of the ACTIVE, another Coast Guard member, and a civilian friend. He also sent some of them to a Coast Guard member and a civilian via Snapchat.

## Notice of Theory of Liability

Appellant asserts he was deprived of due process because, although he was charged with sexual assault by causing bodily harm under Article 120(b)(1)(B), UCMJ, he was tried and convicted of sexual assault of a person incapable of consenting due to impairment by alcohol under Article 120(b)(3)(A). This, in effect, is a claim of variance between what was pleaded and what was proved, which is a question of law that we review *de novo*. *United States v. Treat*, 73 M.J. 331, 335 (C.A.A.F. 2014).

"The due process principle of fair notice mandates that an accused has a right to know what offense and under what legal theory he will be convicted. The Due Process Clause of the Fifth Amendment also does not permit convicting an accused of an offense with which he has not been charged." *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013) (internal quotation marks, citations, and alterations omitted). The military is a "notice pleading jurisdiction"; a specification serves to provide adequate notice as long as it "alleges every element of the charged offense expressly or by necessary implication." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (quoting R.C.M. 307(c)(3)).

Here, as is undisputed, the specification expressly alleged every element of, and adequately put Appellant on notice that he was charged with, sexual assault by causing bodily harm under Article 120(b)(1)(B), UCMJ. Appellant, however, urges that under a proper interpretation of Article 120, he was actually tried and convicted of a distinct, uncharged theory of liability: sexual assault of a person incapable of consenting due to impairment by alcohol under Article 120(b)(3)(A). Based on our own review of the record, we have also considered—and, at our request, heard argument on—a third theory of liability potentially raised by the evidence: sexual assault of an asleep, unconscious, or otherwise unaware person under Article 120(b)(2). Because of the close evidentiary interplay among the three theories of liability in this case, it is concededly a close call. But after careful deliberation, we are satisfied that the Government tried the case and the members convicted on a bodily harm theory.

We begin by interpreting the statutory meaning of each of the three provisions under Article 120, UCMJ (2016).[4] Article 120(b)(1)(B) prohibits "commit[ting] a sexual act upon another person by causing bodily harm to that other person." "Bodily harm" means "any offensive touching of another, however slight, including any nonconsensual sexual act[.]" Art. 120(g)(3), UCMJ. "The term 'consent' means a freely given agreement to the conduct at issue by a competent person." Art 120(g)(8)(A), UCMJ. "Lack of consent may be inferred based on the circumstances of the offense. All of the surrounding circumstances are to be considered in determining whether a person gave consent[.]" Art. 120(g)(8)(C), UCMJ.

---

[4] Subsequently amended by Pub. L. No. 114-328, 130 Stat 2000.

Article 120(b)(2) prohibits "commit[ting] a sexual act upon another person when the person knows or reasonably should know that the other person is asleep, unconscious, or otherwise unaware that the sexual act is occurring."

Article 120(b)(3)(A) prohibits "commit[ting] a sexual act upon another person when the other person is incapable of consenting to the sexual act due to impairment by any drug, intoxicant, or other similar substance, and that condition is known or reasonably should be known by the person[.]"

Article 120(g)(8)(B) adds that a "sleeping, unconscious, or incompetent person cannot consent."

In reading these provisions together, we must presume "that the legislature had a definite purpose in every enactment, and it is the construction that produces the greatest harmony and least inconsistency which must prevail." *United States v. Johnson*, 3 M.J. 361, 362 (C.M.A. 1977). We also must account for "the 'surplusage' canon—that, if possible, every word and every provision is to be given effect and that no word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017). *See also Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of § 1519 that would render superfluous an entire provision passed in proximity as part of the same Act.").

Applying these tenets—and noting, as was the case in *Sager*, that the provisions are separated by the disjunctive "or," *Sager*, 76 M.J. at 160–61—we agree with Appellant that we must resist reading Article 120(b)(1)(B) in a way that would render (b)(2) and (3) as mere subsets of it. We hold, instead, that Article 120(b)(1), (2), and (3) represent distinct theories of liability.

The distinction lies in the difference between *did not consent* and *was unable to consent*. We have previously held that sexual assault by causing bodily harm is distinct from sexual assault by threatening or placing another in fear under Article 120(b)(1)(A) because each has an

element that the other does not: lack of "actual consent" for sexual assault by causing bodily harm; and a communication or action causing a reasonable fear for sexual assault by threatening or placing another in fear. *United States v. Clifft*, 77 M.J. 712, 718 (C.G.Ct.Crim.App. 2018), *review denied*, 78 M.J. 55 (C.A.A.F. 2018). Likewise here. Under a bodily harm theory, the Government bears "the affirmative responsibility to prove that [the putative victim] *did not, in fact, consent*," which is distinct from the other two theories, where the Government must prove the putative victim's "*legal inability to consent*." *United States v. Riggins*, 75 M.J. 78, 84 (C.A.A.F. 2016) (holding that assault consummated by battery was not a lesser included offense of sexual assault and abusive sexual contact by placing in fear) (emphasis in original).

This distinction is not blurred by the statutory admonition that a "sleeping, unconscious, or incompetent person cannot consent," because that speaks to a legal inability to consent, not actual lack of consent.[5] Still, to avoid the risk of variance, practitioners and military judges must be vigilant of the difference between a theory that a putative victim *did not, in fact,* consent (bodily harm) and that a putative victim was *legally unable* to consent (e.g., incapacitated or sleeping).

Appellant points, with credence, to aspects of the Government's case that would seem to support a legally-unable theory. In his closing, the trial counsel repeatedly emphasized the photographs that Appellant had taken on his cell phone. They were time-stamped, providing photographic evidence and a chronology of Appellant's crimes. In the middle of this series are two photographs of Appellant's fingers penetrating ENS W's vagina where her head is not visible. Both before and after that are photographs showing a nude ENS W lying in bed with her head to the side, eyes closed. The trial counsel invited the members to notice "the hair strewn about her face, it never moves. The hair on the pillow never moves. Does she look like somebody who is consenting? Could anybody mistake that for somebody who's saying, yes, let's get it on? Absolutely not." (R. at 781.)

---

[5] Art. 120(g)(8)(B); *Riggins*, 75 M.J. at 84 ("We note, of course, that for both of the Article 120, UCMJ, offenses charged in the instant case a '[l]ack of verbal or physical resistance or submission resulting from ... placing another person in fear does not constitute consent.' Article 120(g)(8)(A), UCMJ. However, the fact that the Government was required to prove a set of facts that resulted in LCpl MS's *legal inability to consent* was not the equivalent of the Government bearing the affirmative responsibility to prove that LCpl MS *did not, in fact, consent*.").

After reviewing the photographs with the members, the trial counsel played an excerpt from Appellant's previously-admitted interview with the Coast Guard Investigative Service (CGIS), where Appellant asserted that ENS W was a willing participant and had her hand on top of his as he "was fingering her." (R. at 783.) The trial counsel paused the video to interject, "Really? Where is her hand here? It's not there. It's just his hand and that's just his fingers." (*Id.*) He then resumed the video, with Appellant telling the CGIS agent that ENS W "was not unconscious when I took the pictures." The CGIS agent challenged him on this, at which point Appellant said, "No. I -- I retract what I said. She was asleep when I took the pictures." (*Id.*)

Stopping the video, the trial counsel repeated those words: "She was asleep when I took the pictures." (*Id.*) Finally, the trial counsel argued that evidence from Appellant's phone shows "somebody who can text, somebody who can move, somebody who can think, somebody who can make phone calls, all taking very purposeful actions. And we're seeing somebody else who is not." (R. at 784.)

Still, the record as a whole demonstrates that the Government's theory of liability and Appellant's conviction were premised on ENS W's actual lack of consent, not on an inability to consent. First, despite evidence that ENS W seemingly was asleep or unconscious, her own testimony was that she felt Appellant place his fingers into her vagina and that she had not, in fact, consented to that sexual act. This was affirmative evidence of an actual lack of consent.

Second, the trial counsel expressly disavowed other theories of liability in his closing: "Now we're not arguing to you that she was so drunk and so tired that she could not consent. But her level of intoxication and her level of fatigue are factors you should consider in whether or not she was consenting." (R. at 783–4.) And indeed, either a "so drunk" or "so tired" theory, standing alone, would have had its own challenges. Although there was evidence that ENS W felt drunk, there also was evidence tending to support that her level of intoxication was not so severe as to render her incapable of consenting. And although she clearly was very tired, she was apparently awake enough to perceive flashes of the camera and Appellant placing his fingers into her vagina. In fact, when she perceived that Appellant was about to engage in sexual intercourse, she tried to push him away and said no. In other words, when it became really

7

critical in ENS W's mind, she was sober enough and awake enough to be able to decide and to communicate her lack of consent.[6]

As the trial counsel explained, the combination of ENS W's consumption of alcohol, level of intoxication, and fatigue were not intended to prove incapacity, but were, instead, relevant "surrounding circumstances" for the members to consider in deciding whether ENS W actually consented. Art. 120(g)(8)(C); *accord United States v. Gomez*, No. 201600331, 2018 WL 1616633, at *3 (N-M. Ct. Crim. App. Apr. 4, 2018), *review denied*, 78 M.J. 108 (C.A.A.F. 2018) (unpub.).

Third, our sister courts have considered and rejected claims similar to Appellant's; we find them germane and persuasive. *Gomez*, 2018 WL 1616633, at *3; *United States v. Motsenbocker*, No. 201600285, 2017 WL 3430569, at *1 (N-M. Ct. Crim. App. Aug. 10, 2017), *opinion adhered to on reconsideration*, No. 201600285, 2017 WL 4640030 (N-M. Ct. Crim. App. Oct. 17, 2017) (unpub.); *United States v. Long*, 73 M.J. 541, 543 (A. Ct. Crim. App. 2014). To be sure, there are distinctions between those cases and this one, including that our sister courts highlighted evidence of physical or verbal resistance to bolster their conclusion that they were tried under a bodily harm theory. In this case, there was no such evidence, presenting a closer call. Still, verbal or physical resistance is not required to show a lack of consent, Art. 120(g)(8)(A), and, again, ENS W testified to her affirmative non-consent. These distinctions are thus not dispositive and we agree with our sister courts' underlying reasoning.

Fourth, the record reveals that Appellant was convicted under a bodily harm theory. The military judge plainly instructed the members that to convict Appellant of the specification, they had to be convinced beyond a reasonable doubt that ENS W did not consent. She further instructed that the evidence had raised the issue of whether ENS W consented and that "[a]ll of the evidence concerning consent to the sexual conduct is relevant and must be considered in determining whether the government has proven the elements of the offense." (R. at 752.) The members found Appellant guilty of the charge and specification without any exceptions or

---

[6] None of this is to imply that an incapacity theory also would not have been viable in this case—or perhaps even the better charge—only that there was evidentiary support for pursuing, instead, a bodily harm theory.

substitutions. "We can presume they followed the law, found a lack of consent beyond a reasonable doubt, and convicted Appellant of precisely the offense with which he was charged." *Clifft*, 77 M.J. at 719.

On the whole, we are satisfied that Appellant was properly charged, tried, and convicted, without variance, of sexual assault by causing bodily harm and thus was not deprived of due process.

### Ineffective Assistance of Counsel

We review Appellant's claim of ineffective assistance of counsel *de novo*. *United States v. Akbar,* 74 M.J. 364, 379 (C.A.A.F.2015). The bar for an appellant to prevail on such a claim is high. *Id.* at 371. An appellant must show: (1) that his counsel's performance was deficient, that is, fell below an objective standard of reasonableness; and (2) that but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* (citing *Strickland v. Washington,* 466 U.S. 668 (1984)).

To establish the first prong, an appellant must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. This presumption "is rebutted by a showing of specific errors made by defense counsel that were unreasonable under prevailing professional norms." *United States v. Davis,* 60 M.J. 469, 473 (C.A.A.F.2005) (citation omitted). "An appellant must establish a factual foundation for a claim of ineffectiveness; second-guessing, sweeping generalizations, and hindsight will not suffice." *Id.* (citations omitted). In assessing counsel's performance, "we do not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine whether counsel made an objectively reasonable choice in strategy from the available alternatives." *Akbar*, 74 M.J. at 379 (citing *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)) (internal quotation marks omitted).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. "In considering whether an investigation was thorough, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Akbar* at 379–80 (quoting *Burger v. Kemp,* 483 U.S. 776, 794 (1987)).

Moving to the second prong, even when there is deficient performance, it must be so prejudicial "as to indicate a denial of a fair trial or a trial whose result is unreliable." *Davis,* 60 M.J. at 473 (citation omitted). The appellant must show that but for the deficient performance, there is a reasonable probability that the outcome would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

Here, Appellant asserts his trial defense counsel were ineffective because they "failed to obtain necessary expert assistance to confront [ENS W's] claim of intoxication," and that expert testimony "would have been crucial in attacking [ENS W's] credibility." (Appellant's Brief at 13, 16.) We disagree.

In an affidavit, Appellant's civilian defense counsel states that he initially submitted a request to the Convening Authority to fund a forensic toxicologist, but that was denied. He deliberately opted not to further pursue expert assistance for several reasons. First, he was concerned that even Defense experts would make concessions undermining his theory of the case. Specifically, ENS W indicated she did not remember kissing Appellant, even though the taxi driver witnessed it. Trial defense counsel's theory was that this was not due to memory loss, but because she was lying to cover up her fraternization with Appellant. An expert, however, would likely concede that the lapse could, instead, have resulted from the phenomenon of fragmentary memory. Second, he believed he could rely on non-expert testimony that ENS W had only a limited amount of alcohol—about seven drinks over several hours—and did not appear intoxicated to the taxi driver to appeal to the members' common sense that she was not overly intoxicated—without risking contradictory testimony from experts. Finally, he assessed that moving to compel experts would prompt the Government to employ their own, which he wished to avoid and instead argue that the lack of such evidence raised reasonable doubt.

We conclude that this was an objectively reasonable strategic choice. The civilian defense counsel cogently explained the potential risks of further pursuing expert assistance. Even if appellate counsel may have chosen a different course, we cannot say that trial defense counsel's calculus fell outside "the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.

Nothing presented by Appellant undermines this conclusion. First, although Appellant cites a series of articles, cases, and even the results of a Google search to show how experts could have assisted the Defense,[7] we may presume that trial defense counsel were competent, *id.*, and just as capable as appellate defense counsel of conducting an adequate investigation into potential benefits and risks of pursuing expert assistance without actually consulting experts. Second, nothing presented demonstrates that any of the civilian defense counsel's reasons for not pursuing experts were unfounded or unreasonable. Finally, as we have addressed, this was a bodily harm case, not incapacity due to impairment by alcohol. The Government specifically disavowed that ENS W was too drunk to consent and instead pursued a theory that a combination of the effects of alcohol, fatigue, and other circumstances proved an actual lack of consent. The effects of alcohol, particularly on memory, remained an issue, but, contrary to Appellant's assertion, this case was about whether ENS W actually consented, not about alcohol.

In sum, Appellant has not shown that his trial defense counsel's decision not to further pursue expert assistance fell below an objective standard of reasonableness. We are also not persuaded that the outcome would have been different had the Defense employed experts. Appellant's claim of ineffective assistance thus fails on both prongs of the *Strickland* test.

### M.R.E. 412 Evidence

Appellant asserts that the military judge erred by ruling that evidence that ENS W and MK3 F engaged in consensual kissing earlier in the evening of the alleged assault was inadmissible under M.R.E. 412. We review for an abuse of discretion. *United States v.*

---

[7] The Government challenges the propriety of us considering such references, asserting that it would constitute an impermissible expansion of the factual record. *See* Joint Rule of Appellate Procedure 6(b). Appellant counters that they are mere citations that illustrate viable avenues of investigation that trial defense counsel allegedly failed to pursue. We decline to decide this thorny issue here, for whether or not we consider them, Appellant's claim fails.

*Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011). "[T]he abuse of discretion standard is strict, 'calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)).

As a rule of exclusion, M.R.E. 412 generally bars evidence offered to prove that an alleged victim of a sexual offense engaged in other sexual behavior or has a sexual predisposition. M.R.E. 412(a); *United States v. Guzman*, 79 M.J. 856, 861 (C.G. Ct. Crim. App. 2020). "The rule is intended to shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *Ellerbrock*, 70 M.J. at 318 (internal alterations, quotation marks, and citations omitted). The rule, however, provides for exceptions, including "evidence the exclusion of which would violate the constitutional rights of the accused." M.R.E. 412(b)(1)(C).

An accused seeking admission of evidence under M.R.E. 412 has the burden of establishing that he is entitled to one of its exceptions. *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010). To determine if a claimed exception applies, a military judge must determine whether the offered evidence is "relevant, material, and [whether] the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock,* 70 M.J. at 318. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." M.R.E. 401(a); *Ellerbrock,* 70 M.J. at 318. Evidence is material if "the fact is of consequence in determining" Appellant's guilt. M.R.E. 401(b); *United States v. Dorsey,* 16 M.J. 1, 6 (C.M.A. 1983). Materiality is based on a "multi-factored" test: (1) the importance of the issue for which the evidence was offered in relation to the other issues in the case; (2) the extent to which this issue is in dispute; and (3) the nature of the other evidence in the case pertaining to the issue. *Ellerbrock*, 70 M.J. at 318.

To establish that the admission of evidence is constitutionally required, an accused must show that the evidence is "necessary" because it is relevant, material, and favorable to his defense. *Smith*, 68 M.J. at 448. In this context, "favorable" is synonymous with "vital." *Id.*

Even relevant and material evidence offered as an exception to M.R.E. 412 will be excluded unless an accused can demonstrate that its probative value outweighs the dangers of unfair prejudice. M.R.E. 412(c)(3); *Ellerbrock*, 70 M.J. at 319. "Those dangers include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Ellerbrock*, 70 M.J. at 319 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

Here, although the military judge allowed other evidence under M.R.E. 412, she ruled that evidence that ENS W kissed MK3 F was not relevant, not probative, and, even to the extent such evidence had any probative value, it was outweighed by the likelihood it "would confuse or distract the fact finder and a needless waste of the court's time . . . ." (Appellate Ex. XXV at 3.) This was not an abuse of discretion.

Whether ENS W kissed MK3 F had virtually nothing to do with whether she later consented to Appellant penetrating her vagina with his fingers. Appellant's assertions—that the evidence was relevant because if ENS W was capable (or appeared capable) of consenting to kissing MK3 F, she was capable (or appeared capable) of consenting to sexual activity with Appellant and that it tends to show that she exaggerated her "level of incapacity," (Appellant's Brief at 30)—are tenuous to begin with. But more pointedly, they miss the mark because, as addressed above, they misapprehend the theory of liability for which Appellant was tried and convicted. The Government was not obligated to prove that ENS W *could not* consent. It was, instead, obligated to prove that ENS W *did not*, in fact, consent, to which she affirmatively attested. Thus, whether ENS W *could* consent to kissing another man earlier in the evening was, as the military judge ruled, irrelevant, not probative, and outweighed by risks of confusing the issues and wasting time. We conclude that she did not abuse her discretion.

### Legal and Factual Sufficiency

Appellant asserts that the evidence supporting his conviction for sexual assault is legally and factually insufficient. We review *de novo*. Article 66(c), UCMJ; *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002).

Evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citations omitted). This is a low threshold. *Id.* The phrase "beyond a reasonable doubt" does not "mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented." *Id.* at 221. Instead, we must draw "'every reasonable inference from the evidence of record in favor of the prosecution.'" *Id.* (quoting *United States v. Robinson*, 77 M.J. 294, 298 (C.A.A.F. 2018)).

Factual sufficiency, on the other hand, requires that we, after weighing the evidence and making allowances for not having personally observed the witnesses, are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

Having resolved that Appellant was, as charged, tried and convicted of sexual assault by causing bodily harm—not sexual assault of an incapacitated person—we assess the sufficiency of the evidence supporting the following elements: (1) that Appellant committed a sexual act upon ENS W by causing penetration, however slight, of her vulva with his finger; (2) that Appellant did so by causing bodily harm to ENS W, to wit: committing the said sexual act; (3) that Appellant did so without ENS W's consent; and (4) that Appellant did so with the intent to arouse or gratify his sexual desires. Art. 120(b)(1)(B), UCMJ; MCM, Pt. IV, ¶ 45.b.(4)(b).

The evidence—including the damning photographs—strongly supports ENS W's testimony that she did not consent to Appellant placing his fingers in her vagina and that Appellant did not suffer from a reasonable mistake of fact about that. A rational fact-finder could have found each element beyond a reasonable doubt. The evidence is thus legally sufficient. We, too, are convinced of each element beyond a reasonable doubt. The evidence is thus factually sufficient.

## Decision

We determine that the findings and sentence are correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge McCLELLAND and Judge HAVRANEK concur.



For the Court,

Sarah P. Valdes
Clerk of the Court